RONALD S. LONGLEY, *by Gdn. vs.* JOSEPH H. MCCULLOUGH, *et al.*

AUGUST 4, 1942.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J.   This cause is a suit in equity in which the main relief sought is the setting aside of two promissory notes and mortgages made by the complainant to the first and principal respondent, hereinafter referred to as the respondent, and for an accounting between the parties, especially as to sums of money alleged to have been wrongfully obtained by the respondent from the complainant.

It is now before us on an appeal by the complainant from a final decree of the superior court, which was entered after a hearing on bill, answer and replication and in which all the prayers for substantial relief were denied, except the one for an accounting between the complainant and the respondent, and it was ordered that under such accounting the complainant pay forthwith to the respondent the sum of $3160.90,

with interest thereon at the rate of 6% per annum from April 15, 1940 to the date of payment.

Frank J. McCullough and Gladys H. Page were also joined as parties respondent in the bill, which was brought in the name and behalf of the complainant by Charles. F. O'Meara, the guardian of his estate. But relief against either of them is dependent upon relief against the principal respondent, and we do not find any reason for mentioning either of them again, except the latter, only incidentally.

The promissory notes above mentioned were for $4000 each and dated January 15, 1931; and one of them was secured by a mortgage on real estate and the other by a mortgage on personal property, known as a "diner" and consisting of a movable building and its equipment, located on a highway and used as a restaurant. By the bill it is sought to have these notes and mortgages declared void by reason of "mental weakness and incompetency" of the complainant, which is alleged to have been fully known to the respondent, and also by reason of want of consideration and by reason of fraud practiced by him upon the complainant. It is further alleged in the bill that the respondent had from time to time since 1930 wrongfully and fraudulently procured from the complainant sums of money aggregating at least $5000.

All these grounds for relief are denied by the respondent in his answer; and the trial justice in his decision, rendered after final hearing, decided in favor of the respondent on all of the issues of fact thus raised.

There is little contradiction in the evidence in the cause. Under his father's will, Longley was a beneficiary, to the amount of several hundred thousand dollars, or real and personal property, including securities. With his consent and by a family arrangement, securities to a large amount in value were placed in the possession and under the control of his mother, who, by a written declaration of trust executed by her and dated May 12, 1915, was to hold them in an irrevocable trust for his benefit during his lifetime.

The trust instrument contained a provision to the effect

that in case circumstances should later exist which, in the absolute discretion of the trustee, would justify such action, she could transfer absolutely to him any of the trust fund free of the trust. Under this provision she, by an instrument dated January 16, 1922, transferred to him the entire principal of the trust estate with all accumulated income therefrom. The total value of securities described in the schedule annexed to his instrument evidently was many thousands of dollars. In this instrument she said: "I do now declare that in my judgment and in my said discretion circumstances do now exist which justify and render expedient the placing at the disposal of said Ronald S. Longley for his advancement and for his sole use and benefit the entire principal of said trust estate and all accumulated income therefrom." This instrument was also signed by the present complainant and was witnessed by an experienced lawyer of this state, who was acting as attorney for the trustee.

Thereafter the complainant engaged in a number of business enterprises in this state, investing considerable sums of money in them, but was not very successful. These enterprises included the operation of diners and the purchase and sale of automobiles.

In 1927 one Willard Sweet, who had for many years been an automobile salesman for an automobile concern, but was then out of employment, solicited the complainant and the respondent, with both of whom he had been acquainted for some years but who did not know each other, to join with him in a new business of buying and selling automobiles, he to supply his special training, experience and services in that line of business and the others to supply the necessary money. The respondent had for many years been a traveling auditor for a large business concern and understood accounting, but was then not employed.

Sweet introduced the other two men to each other and the respondent made some investigation of the standing and business connections of the complainant. The result of conferences by the three men was that it was agreed that they

should join in the business and form a new corporation therefor, the complainant and respondent to supply equally the capital of $10,000 and the stock to be equally divided among the three. The complainant was to be the president; the respondent was to be the treasurer and keep the books of the concern; and Sweet was to be the vice-president and secretary and also the general manager of the business.

This plan was carried out and the corporation was formed; the capital was paid in as agreed and the stock divided equally; and a place of business was secured. The business was begun at the end of March 1927 and $5000 was then borrowed by the corporation from a bank on a note endorsed by each of them. For the period while all three were stockholders Sweet contributed his full time during each business day but the other two men put in only part of their time, the respondent most of each day and the complainant a smaller part. For a number of years the business was quite profitable.

In November, 1927, the respondent was informed that it had been arranged to sell all the stock of the corporation to an unnamed purchaser for the sum of $25,000 and he was induced to turn in his stock for one-third of that sum. But the other two stockholders simply took his shares and divided them equally between themselves, he being paid therefor by a personal check of the complainant. He then learned what they had done; but rather than make any trouble about the matter, he accepted and cashed the check and retired from the business. One dividend of $500 to each of the three stockholders had previously been paid. Up to the time when his connection with the business was thus severed he had loaned no money to the corporation.

Thereafter, for about a year the respondent had no connection with the business or the other two men. Then Sweet came to see him to try to arrange to have him loan some money to the corporation. A little later the three men had a conference together and it was arranged that the respondent should thus loan money on notes made by the corpora-

tion and endorsed by the complainant. This went on for several years and the respondent also assisted in financing the purchase of automobiles by the corporation by lending it money from time to time on its notes secured by pledges of the automobiles.

Loans continued to be made by the respondent to the corporation on its notes endorsed by the complainant until, with accumulated and unpaid interest and with bonuses agreed on for renewing notes, there were outstanding on October 20, 1930 such notes of the aggregate amount of $14,500, with some interest. One of these notes, in the principal sum of $4000, was payable on December 23, 1930. The respondent had previously given notice to the corporation and the complainant that this note must be paid on its due date. As it was not paid on that date, the respondent took up the matter with the complainant's attorney, who referred him to O'Meara, the present guardian, who was then acting as business adviser to the complainant and held a power of attorney from the latter with extensive powers.

According to the respondent's testimony he then had several conferences with O'Meara in the matter, and was finally assured by the latter that the complainant would take up the four notes of the corporation, endorsed by himself, by executing and delivering to the respondent the following: First, a note of the complainant to the respondent for $4000 and a mortgage by the former, securing the payment of this note, on certain real estate of his; second, another like note of the same amount and a mortgage, securing the same, on a diner, its contents, etc.; third, a transfer by the complainant of a note for $3000 of a third person to the complainant, held by the latter, and a chattel mortgage to him securing that note; and fourth, a transfer by the complainant of a note for $3500 of another person to the complainant and a real estate mortgage securing that note.

On January 17, 1931, the complainant carried out the assurance given to the respondent by O'Mara, by executing the necessary notes, mortgages and transfers, all of which

were dated January 15, 1931, and delivering them to the respondent, together with the notes and mortgages covered by such transfers. The notes and mortgages made by the complainant are the ones directly involved in the instant cause.

The respondent thereupon transferred and delivered to the complainant the above-described notes of the corporation, which had been endorsed by the complainant and amounted to the principal sum of $14,500, the same as the amount of the notes received from him by the respondent.

A few days later a petition, signed by the complainant, was filed in the probate court of the city of Pawtucket, where he resided, for the appointment of a guardian of his estate, on the ground that he was a person who, from want of discretion, so spent or wasted his estate that he was likely to bring himself to want. A little later O'Meara was appointed such guardian and has continued to be such ever since. The respondent in his testimony denied that he had any knowledge or notice of this petition or the granting of it until a considerable time afterwards; and no evidence was introduced to the contrary.

Thereafter for several years O'Meara, as guardian, made the respondent many payments of interest on the complainant's two notes for $4000 each, above described, and some payments on the principal. The respondent collected in full the indebtedness due on one of the assigned notes. He discovered that, although the other one purported to be for $3500, the makers owed only $2000 on it. The respondent collected that sum from the makers and was paid the difference of $1500 by O'Meara as guardian of the estate of the complainant.

For default in the payment of the complainant's note for $4000, secured by a mortgage on real estate, and after an abortive foreclosure sale, the mortgage was foreclosed by sale on July 18, 1939, and at that sale the respondent bought the real estate for $4500 and had it conveyed to him.

On November 15, 1939, the chattel mortgage securing the

other note for $4000 was foreclosed by the respondent and at the sale the mortgaged property was sold to the respondent Page for $300, she being the highest bidder. As a reason for the small price, it was shown, by uncontradicted testimony, that without the knowledge of the respondent the diner had been sold by O'Meara, as guardian, to the respondent Page and it had been removed to a much less desirable location and it and its equipment had greatly deteriorated. After this sale, there being a great deficiency, the respondent sought to collect it from the complainant's property, in charge of O'Meara, as guardian; and not long afterwards the present suit was brought.

The trial justice in his decision at the close of the hearing of the cause on its merits, at which hearing the complainant was never present and no deposition by him was introduced, found that all the promissory notes which were made and delivered by the Sweet Motor Sales Company to the respondent and endorsed by the complainant were supported by valuable consideration furnished by the respondent to the maker. This finding is strongly supported by documentary evidence. The trial justice also found that there was valuable consideration furnished by the respondent to the complainant for the promissory notes, for $4000 each, made and delivered by the complainant to the respondent. He also made in the final decree special findings of fact to the same effect.

He further found that there was no fraud or collusion between the respondent Joseph H. McCullough and the others named in the bill of complaint as respondents. He made a special finding of fact to the same effect in the final decree. He further made in the decree a special finding of fact "that said notes and mortgages were properly obtained from the said Ronald S. Longley by the respondent Joseph H. McCullough and no fraud was practiced upon said Ronald by said Joseph H. McCullough."

Sweet was most active in the business of the Sweet Motor Sales Company during all the period when the respondent

was loaning money to it on its notes which were endorsed by the complainant; and he was in the best position to know whether the former was taking any unfair advantage of the latter. He testified that the former was well known to him and was the highest type of man and that he did not know of any indication that the respondent took an unfair advantage of the complainant.

We cannot find, from the evidence, that any of the above-stated findings of fact by the trial justice was not supported thereby.

This leaves for consideration the matter of the alleged defective mentality of the complainant. It is clear, from uncontradicted evidence in the cause, that from his very early youth he was not up to the ordinary standard physically or mentally; and the question is whether his condition was such as to prevent the documents dated January 15, 1931 and executed on January 17, 1931, as above set forth, from being enforceable against him.

An eminent expert on mental and nervous diseases and abnormalities testified in this cause as a witness for the complainant. He did so on the basis of what he had learned on two occasions. One of these was when, on September 12, 1932, he had examined the complainant at the request of the probate judge before whom was pending a proceeding for the discharge of the complainant's property from guardianship. The other occasion was when this expert witness attended the hearing in the probate court on that proceeding and listened to and observed the present complainant while the latter was testifying. In the instant cause this witness had the advantage of having a transcript of the testimony of the present complainant at the former hearing.

This expert witness testified in the instant cause that in his opinion, formed after a long and careful examination, the complainant "was mentally retarded and that his mental retardation was the expression of a congenital defect of brain—'congenital' meaning that he was born with a brain of a rather poor quality"; and that this defect was incurable.

404

He testified also that where there is a question of judgment, precision and experience such persons are at a disadvantage. He would not say that the complainant was of unsound mind and he also testified that "any man might do business with Mr. Longley or anybody else of this type and not know that he was dealing with a man who was mentally backward."

The above-mentioned lawyer, who had acted as attorney for the complainant's mother in connection with her trusteeship over the complainant's real propety and securities, testified as a witness for him in this cause. He testified that he and the complainant had grown up together and had gone to school together.

He also testified, in substance, that the complainant was retarded in his development; that throughout his adult life he was in need of protection in business transactions involving judgment and discretion; that he was unable to compete on a parity with a person having an adverse interest to his; and that he would have been best protected during his adult life under guardianship; but that he had never been insane or idiotic.

In considering this testimony, it should be kept in mind that the witness, as above stated, had acted as attorney and witness for the complainant's mother in connection with the instrument by which she had terminated her trusteeship and had returned the entire control of his property to the complainant.

In his decision the trial justice in this cause said that the expert witness as to the complainant's mental condition stated that any man might do business with the complainant without appreciating the fact that he was a person of congenital mental retardation. In the decree the trial justice made findings of fact to the effect that at the time of the execution and delivery by the complainant to the respondent of the former's promissory notes, dated January 15, 1931, and the mortgages securing the payment of the same, the complainant was mentally competent to transact busi-

ness; and that these notes and mortgages were properly obtained from him by the respondent.

In this connection the following facts, shown by the evidence, are relevant and important. Before January 15, 1931 O'Meara had known the complainant for some years and was familiar with the affairs of Sweet Motor Sales Company, having had an audit of its books made. He arranged for the drawing of these notes and mortgages and the execution of them by the complainant. He knew about the facts and circumstances of the making and delivery of them. Yet, as guardian of the estate of the complainant, he afterwards, for many years and until a short time before the bringing of this suit, made payments, in behalf of the complainant, to the respondent on these notes and mortgages and had not questioned their validity; and he had included these payments in his accounts allowed by the probate court.

The attorneys for the complainant, in support of their contention that these notes and mortgages were not binding on the complainant, seem to rely to a large extent upon the case of *Cundall* v. *Haswell,* 23 R. I. 508. But this court laid down in that case at page 510, the following rule, quoted from 1 Parsons, Contracts, (8th ed.) *335: "Mere mental weakness, or inferiority of intellect, will not incapacitate a person from making a valid contract; nor is it easy to define the state of mind which will have this effect. There must be such a condition of insanity or idiocy as, from its character or intensity, disables him from understanding the nature and effect of his acts, and therefore disqualifies him from transacting business and managing his property."

We believe this to be a fair and correct statement of the law applicable to the instant cause. Applying it to the evidence as to the mental condition of the complainant, we are of the opinion that the trial justice was supported by the evidence in finding as he did in the final decree: "That, at the time of the execution and delivery of said notes and mortgages by the complainant to the respondent, Joseph H.

McCullough, said Ronald S. Longley was mentally competent to transact business."

Because of this conclusion and others which we have stated herein, we are of the opinion that the decree appealed from was not against the law or the evidence, but should be affirmed.

The complainant's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

ON MOTION FOR REARGUMENT.

OCTOBER 23, 1942.

PER CURIAM. After the filing of our opinion, the complainant, by leave of court, filed a motion for permission to reargue this cause on one specified ground.

We have considered this motion and have reread not only those parts of the transcript of the evidence which are relied upon in support of that ground but also all other relevant parts. Upon consideration thereof, we do not find that the complainant's contention is supported by the evidence and we find nothing in his motion that was not considered and passed upon by us before the filing of our opinion.

Motion denied and dismissed.