Joseph ROE

v.

Louis E. GELINEAU et al.

No. 2000–136–Appeal.

Supreme Court of Rhode Island.

April 12, 2002.

Timothy Conlon, Providence, for Plaintiff.

Thomas R. Bender, William T. Murphy, James T. Murphy, Linn Foster Freedman, Providence, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

The plaintiff, Joseph Roe (plaintiff or Roe), sued the various defendants for alleged physical, emotional, and sexual abuse suffered while he was a minor in the custody of the State of Rhode Island (state), residing at the Saint Aloysius Home. A Superior Court justice found that the statute of limitations for bringing the action had expired and granted summary judgment in favor of the defendants. The plaintiff has argued on appeal that the statute of limitations was tolled by G.L. 1956 § 9–1–19 [1] because he was of "unsound mind." We are sensitive to the lifelong trauma that childhood physical and sexual abuse can cause, and we recognize the legal and psychological obstacles that beset the victims of such abuse. Here, however, we reject the plaintiff's contention that unsound mind was evidenced in his case by his transient inability to recall the abuse, his inability to deal with it in therapy, and his consequent inability to bring specific claims relating to the abuse until he filed this lawsuit. We do so because the plaintiff has failed to provide the proof required by our case law on repressed recollection. In light of the historical scope of the tolling disabilities, the longstanding legal significance of the term "unsound mind," and the practical benefits of adopting an operational definition of the term, we are of the opinion that the inability to manage one's day-to-day activities is the proper barometer for measuring whether a plaintiff's mental state falls within the range of conditions that constitute an unsound mind. Therefore, we affirm the judgment of the Superior Court and conclude that Roe's alleged unsound mind did not fall within the purview of the tolling statute. The plaintiff's contract claims against St. Aloysius are pending in the Superior Court.

### Facts and Procedural History

The plaintiff,[2] at the age of twenty-three, filed a multi-count complaint on June 3, 1996, alleging that he had been physically, emotionally, and sexually abused while he was a resident at the Rhode Island Catholic Orphan Asylum d/b/a Saint Aloysius

---

1. As of 1996, G.L.1956 § 9–1–19 provided:
   "If any person at the time any such cause of action shall accrue to him or her shall be within the age of eighteen (18) years, or of unsound mind, or imprisoned, or beyond the limits of the United States, the person may bring the same, within the time limited under this chapter, after such impediment is removed."
   Public Laws 2001, ch. 237, § 1, ch. 407, § 1, deleted the legal disability of imprisonment.

2. The plaintiff was permitted to proceed anonymously as "Joseph Roe."

Home (St. Aloysius) in Greenville, Rhode Island. When he was placed at St. Aloysius in 1982, plaintiff was in the custody of the state Department of Children, Youth and Families (DCYF). According to plaintiff, the Diocese of Providence of the Roman Catholic Church owned St. Aloysius and operated it under a contract with DCYF as a residential treatment facility for boys between the ages of five and fourteen who suffered behavioral, emotional, or developmental problems. Alleging that he suffered abuse at the hands of staff members over a period of approximately two and one-half years, Roe asserted various personal injury claims against Bishop Louis E. Gelineau (Bishop Gelineau); the Roman Catholic Bishop of Providence, a corporation sole (RCB); St. Aloysius and its managing director, Father Robert McIntyre; the state; eight officers of DCYF, including two designated as John Doe 1, Director, and John Doe 2, Executive Director;[3] and twenty other John Doe or Jane Doe defendants.[4] The plaintiff also asserted a breach-of-contract claim against St. Aloysius.

In an amended complaint, plaintiff alleged that the three-year statute of limitations on the personal injury claims had been tolled or suspended for several reasons, including the delayed discovery of his harm, his incapacity or disability under § 9–1–19, and because of defendants' fraudulent concealment of facts underlying plaintiff's claims, their concealment of negligence, fraud, breach of a fiduciary duty, and the conspiracy among them to commit negligent acts.

The defendants Bishop Gelineau and RCB filed a Super.R.Civ.P. 12(b)(6) motion to dismiss the personal injury claims on the ground that plaintiff filed the claims after the expiration of the statute of limitations set forth in § 9–1–14(b); all other defendants also filed similar motions. In response to the motions to dismiss, plaintiff argued that his minority tolled the statute of limitations and that he was of unsound mind until some point within three years of filing the complaint. Section 9–1–19.

Various other plaintiffs brought nine similar cases that were assigned to a single justice "for management purposes," following which the justice granted the motion of defendants Bishop Gelineau and RCB to consolidate this case with the other pending cases. While the motions to dismiss were pending and Bishop Gelineau remained a defendant, the justice granted summary judgment in favor of RCB, and this Court affirmed the judgment, holding that the corporate veil could not be pierced. *Doe v. Gelineau*, 732 A.2d 43, 52 (R.I.1999).

Because the motion justice considered documents outside the pleadings, the motions to dismiss were treated as Super.R.Civ.P. 56 motions for summary judgment, as provided in Rule 12(b). *Cipolla v. Rhode Island College Board of Governors for Higher Education*, 742 A.2d 277, 280 (R.I.1999) (per curiam); *Bethlehem*

---

**3.** Each of the DCYF officers was named individually and in his or her capacity as a DCYF officer, except for Kenneth Fandetti, Director, and Thomas Dwyer, Acting Executive Director, who were named only in their official capacities.

**4.** John/Jane Does 3–12 were the employees, agents, and servants of the State of Rhode Island responsible for licensing, placement, monitoring and supervision of St. Aloysius, John/Jane Does 13–20 were employees, agents and servants of St. Aloysius, responsible for hiring, training and supervision of employees or for assuring that allegations of abuse were reported, and John Does 21–22 were employees, agents and servants who allegedly sexually abused plaintiff while he was placed at St. Aloysius.

*Rebar Industries, Inc. v. Fidelity and Deposit Co. of Maryland,* 582 A.2d 442, 444 (R.I.1990). After finding that plaintiff's claim of unsound mind failed to satisfy the tolling requirements of § 9–1–19, the court entered final judgments in favor of all named defendants with respect to the personal injury claims pursuant to Rule 54(h) of the Superior Court Rules of Civil Procedure; the contract claims against St. Aloysius are still pending. The plaintiff appealed, arguing that the justice erred in finding that plaintiff's claim of unsound mind did not toll the statute of limitations.

### Standard of Review

■ We review *de novo* a justice's decision to grant summary judgment, applying the same rules and standards as those employed by the justice. *Heflin v. Koszela,* 774 A.2d 25, 29 (R.I.2001); *Woodland Manor III Associates v. Keeney,* 713 A.2d 806, 810 (R.I.1998). We shall affirm the judgment only when, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact remains to be decided, and that the moving party is entitled to judgment as a matter of law. *Heflin,* 774 A.2d at 29; *Woodland Manor III Associates,* 713 A.2d at 810. But the nonmoving party cannot prevail by relying solely on allegations or on denials in the pleadings; rather, it must identify or present evidence that a dispute of material fact remains. *Heflin,* 774 A.2d at 29.

■ Before making a final ruling on a motion for summary judgment, however, a motion justice may first need to find certain preliminary facts before moving on to decide the question of law, namely, whether the statute of limitations has run against a plaintiff. *Hall v. Insurance Co. of North America,* 727 A.2d 667, 669–70 (R.I.1999) (per curiam). We review questions of law *de novo. Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates,* 763 A.2d 1005, 1007 (R.I.2001). Here, then the justice must first find whether the particular mental condition in this case constitutes an unsound mind for purposes of the tolling requirements of § 9–1–19. *Kelly v. Marcantonio,* 678 A.2d 873, 879 (R.I.1996).

### Minority under § 9–1–19

Before turning to the merits of plaintiff's claim of an unsound mind, we briefly address an issue discussed during oral argument, namely, how long plaintiff's minority tolled the statute of limitations. The statute of limitations for personal injuries states, "Actions for injuries to the person shall be commenced and sued within three (3) years next after the cause of action shall accrue, and not after." Section 9–1–14(b).[5] The statute is tolled, however, by several legal disabilities under § 9–1–19.

■ It is uncontested that under § 9–1–19, plaintiff's minority tolled his claims, and therefore they could have been brought at any time within the three years after the end of his minority. During the Superior Court proceedings on this issue, plaintiff argued that his minority ended when he turned eighteen on July 26, 1990, and his appellate brief contended that his minority ended upon his emancipation in October 1990. The defendants pointed out that Roe's minority may have ended for tolling purposes on July 26, 1993, under the pre 1988 version of § 9–1–19, in which the age of minority extended to twenty-one for causes of action that arose on or before

5. This wording of § 9–1–14(b) has remained unchanged since before plaintiff's placement in St. Aloysius, with the subsection designations added in the 1985 Reenactment. (P.L. 1985, ch. 150, § 1).

July 1, 1988, whereas the 1988 amendment lowered the age of majority to eighteen for causes of action arising after July 1, 1988. Public Laws 1988, ch. 107, §§ 1, 2. Because plaintiff's claims stemmed from events that took place between 1982 and 1985, the pre 1988 statute would have fixed his age of majority at twenty-one. The plaintiff, however, did not raise that issue in the Superior Court.

■■■■■ It is well established that, under the raise-or-waive rule, this Court refrains from reviewing issues not raised in the trial court. *State v. Breen,* 767 A.2d 50, 57 (R.I.2001). We may review an issue not previously raised only in narrow circumstances, when basic constitutional rights are involved. *Id.* "For example, when an intervening decision of this court or of the Supreme Court of the United States establishes a novel constitutional doctrine, counsel's failure to raise the issue at trial will not preclude our review." *State v. Burke,* 522 A.2d 725, 731 (R.I.1987). To invoke the exception, however, "the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." *Breen,* 767 A.2d at 57. Because Roe's age of minority for statute of limitations purposes implicates none of these circumstances and because Roe could have discovered the issue and presented it to the Superior Court, we deem the issue waived and decline to address its merits.[6]

### Unsound Mind under § 9–1–19:

### Inability to Bring a Specific Claim Due to Repressed Recollection

The parties disagreed on the definition of unsound mind under § 9–1–19 and the effect, if any, of our decision in *Kelly v. Marcantonio, supra,* on that definition. The defendants argued that the motion justice applied the appropriate definition of unsound mind—namely, the inability to manage the day-to-day affairs of life—whereas Roe argued that, for purposes of § 9–1–19, the term should apply not only to a general inability to manage one's affairs, but also should include the inability to bring a specific claim. The plaintiff asserted that his inability to recall or to deal with his abuse and his concomitant inability to file suit for ˙these specific claims are conditions that should be included within the ambit of the term unsound mind, an inclusion that he asserted our opinion in *Kelly* allowed. But, neither our holding in *Kelly* nor the record of this case permits what Roe has proposed.

As we discuss later in this opinion, the term unsound mind historically has meant a general incapacity to protect one's legal rights and manage one's affairs. We did hold in *Kelly* that the inability to bring a particular claim may be included in the purview of the term "unsound mind" for purposes of the tolling statute in one particular context, namely, that of repressed recollection. Including, as plaintiff has proposed, "any adverse mental condition that prevented a potential plaintiff from seeking redress" within the definition of unsound mind, could entirely supplant the statute of limitations and the policies behind it. Roe essentially has attempted to create "a certain remedy" without "having recourse to the laws" of this state. *See* R.I. Const. art. 1, sec. 5.

Specifically, we held in *Kelly* that a trial justice may decide "that repressed recol-

---

**6.** The plaintiff, moreover, did not raise the issue of the pre 1988 statute in his appellate brief, but addressed it only at oral argument, after it was raised in defendants' brief to this Court. Issues that the appellant fails to brief are waived on appeal. *See, e.g., Wilkinson v. State Crime Laboratory Commission.,* 788 A.2d 1129, 1131 n. 1 (R.I.2002).

lection constitutes a scientifically accepted and valid theory and that upon the facts of the specific case, the repressed recollections alleged do in fact collectively qualify as an unsound mind disability under § 9-1-19." *Kelly,* 678 A.2d at 880. We also stated that the trial justice could find that the disabling condition "does not in and of itself qualify as a tolling feature under § 9-1-19" or that "a particular plaintiff has failed to prove sufficient facts establishing the existence of repressed recollections in his or her particular case." *Id.* We went on to hold that it is "the [motion] justice who, in the first instance, must determine * * * whether repressed recollection is included within the tolling condition of 'unsound mind' in a particular case." *Id.* at 879.

Under the standard set forth in *Kelly,* a trial justice is required to hold a hearing to consider scientific evidence and other data in assessing whether repressed recollection has been established. *Id.* at 879-80; *see also DiPetrillo v. Dow Chemical Co.,* 729 A.2d 677, 685-86 (R.I.1999) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (holding that an evidentiary hearing to ascertain the validity of a proffered scientific theory may be required before scientific evidence is admitted)). An evidentiary hearing, however, is not automatically mandated in every case. Only when a party squarely alerts the trial justice that scientific or medical evidence is at issue and makes a threshold showing, by affidavit or offer of proof, that the evidence is derived from a valid scientific theory will the need for a *DiPetrillo* or *Daubert* hearing be triggered. *DiPetrillo,* 729 A.2d at 683-84.

Here, the November 22, 1999 hearing on defendants' motions to dismiss did not require an evidentiary hearing because Roe had failed to provide evidence that his "alleged repressed recollection in a particular case [was] sufficiently relevant, reliable, and scientifically and/or medically established so as to constitute 'unsound mind,' thereby tolling the action limitation period." *Kelly,* 678 A.2d at 879. In addition, for the reasons we discuss *post,* Roe's evidence was insufficient to trigger an evidentiary hearing to ascertain whether his alleged memory problems could toll the limitations period. *See DiPetrillo,* 729 A.2d at 683. Accordingly, the justice did not err in granting summary judgment in favor of defendants.

The plaintiff supported his argument that he was of unsound mind for purposes of § 9-1-19 by submitting an affidavit from Barry Plummer, Ph.D. (Plummer), a licensed psychologist who treated Roe at Bradley Hospital. Plummer stated that plaintiff had briefly mentioned abuse at St. Aloysius, but "it was never something he was able to focus on or process in therapy" because "it was too difficult for him to deal with." Plummer framed his affidavit in general terms that only by inference applied to plaintiff by stating, for example, that memory problems and trauma issues can affect one's ability to bring a claim; but Plummer failed to provide a diagnosis of plaintiff's specific condition, much less did he opine that plaintiff had repressed the recollection of his abuse during a particular period.

Throughout the Superior Court proceedings, plaintiff did not directly assert that he suffered from repressed memory. At the November 22, 1999 hearing, when the motion justice asked, "Where in this case in your pleadings have you referred to repressed recollection?," plaintiff's counsel replied, "I don't believe the pleading uses the term repressed memory." When the justice later asked, "Where is [repressed] recollection of the events medically shown? All I know is somebody says he can't deal

with it, not that he can't recall it," plaintiff's counsel responded, "No, that's not the case, Your Honor. The deposition testimony certainly is replete with instances of the man saying there were periods of time that he did not recall these events," and counsel later added, "[I]t is our understanding that this child did not recall this within three years at the time the suit was filed."

■ In *State v. Quattrocchi*, 681 A.2d 879, 881 (R.I.1996), we stated that an issue of repressed recollection could arise in "circumstances when recollections have been repressed for many years and then released in the course of psychological treatment or psychiatric therapy." Repressed recollection, then, can be considered as the absence of conscious awareness of an event, followed by sudden revelation, recognition, or recovery of the memory. But such is not the case here. In fact, the evidence presented to the motion justice directly contradicted plaintiff's assertion that he was unable to recall the alleged abuse, given that he appears to have discussed the alleged abuse with at least four people on at least five occasions when he was between the ages of thirteen and twenty-two. Moreover, unlike the classic repressed-memory scenario, plaintiff could not ascribe a date certain when his alleged impediment ceased, nor was he able to specifically articulate any rationale to explain why his condition prevented him from filing suit in this case. Rather, plaintiff argued that he "blocked out" the abuse and could not deal with it well enough to file a lawsuit.

■ In our opinion, the evidence Roe presented did not demonstrate as a threshold matter that he suffered from the type of repressed recollection discussed in *Kelly* and *Quattrocchi*. Therefore, plaintiff did not trigger *Kelly's* procedural mechanism, requiring an evidentiary hearing on wheth-

er his alleged repressed recollection constituted an unsound mind for tolling purposes. *See DiPetrillo*, 729 A.2d at 683–84 (holding that no evidentiary hearing was required, because the defendant failed to substantiate sufficiently that the plaintiff's scientific theory was not valid). Thus, we are constrained to conclude that the motion justice did not err in finding that, to the extent that plaintiff alleged that he was unable to bring a specific claim based on memory lapses and the inability to deal with his abuse in therapy, his condition did not constitute a tolling disability under § 9–1–19. Professed inability to recall certain events is not the same phenomenon, psychologically, as repressed recollection.

### Unsound Mind under § 9–1–19:

### Inability to Manage Day-to-Day Activities

Although we have yet to articulate a general definition of unsound mind for purposes of § 9–1–19, such a definition is necessary in this case to determine whether plaintiff was of unsound mind for reasons other than repressed recollection.

■ Generally, in interpreting a statute, we are charged with effectuating the intent of the Legislature in enacting the measure. *Matter of Falstaff Brewing Corp. Re: Narragansett Brewery Fire*, 637 A.2d 1047, 1049 (R.I.1994). In so doing, we are obliged to give words their plain, ordinary meanings; if that meaning is unclear, we apply the meaning most consistent with the intended policies and purposes of the Legislature. *Id.* at 1049–50; *see also Cummings v. Shorey*, 761 A.2d 680, 684 (R.I.2000). Accordingly, in construing the term unsound mind for purposes of § 9–1–19, we examine the historical significance of the tolling disabilities

and explore how the term unsound mind has been interpreted in other contexts.

The Court and Practice Act of 1905, C.P.A.1905, ch. 13, §§ 248, 253, codified both the statute of limitations for personal injuries and the tolling statute in this state. The progenitor of both statutes was England's 1623 Limitations Act, "An Act for Limitation of Actions, and for avoiding of Suits in Law," 21 James I, ch. 16, §§ III, VII, published in *Statutes at Large*, London, 1786 (1623 James I act). Actions for personal injuries under Rhode Island's 1905 limitations of actions statute, however, had to be brought within two years. The 1623 James I act allowed three years for certain causes of action, a period that was later adopted by the General Assembly, in 1971. Public Laws 1971, ch. 200, § 1. The 1623 James I act also established five legal disabilities that tolled the running of the statute of limitations for personal actions until the removal of the impediment. These impediments were: minority ("within the Age of Twenty-one Years"), coverture (requiring that under *"Feme Covert,"* a married woman could sue only through her husband), unsoundness of mind (*"Non compos mentis"*), imprisonment, and absence from the country ("beyond the Seas"). Rhode Island excluded coverture but adopted the remaining four disabilities in its 1905 tolling statute and retained them until 2001, when imprisonment was deleted. Section 9–1–19; P.L.2001, ch. 237, § 1, ch. 407, § 1.

The competing public policy considerations behind the statute of limita-tions, on the one hand, and the tolling statute, on the other, are well documented and have been discussed in earlier opinions of this Court. *Kelly,* 678 A.2d at 878; *Young v. Park,* 116 R.I. 568, 573, 359 A.2d 697, 700 (1976); *Wilkinson v. Harrington,* 104 R.I. 224, 234–35, 243 A.2d 745, 751 (1968). Statutes of limitation promote certainty and finality and avoid stale claims, whereas tolling statutes provide temporary shelter from those limitations for plaintiffs who cannot protect their legal rights while under certain impediments. After the removal of the impediment, claims must be brought within a specific time.

The 1623 James I act used the term *"non compos mentis"*—literally, "not master of one's mind"—in describing what has evolved into the term "unsound mind" used in § 9–1–19.[7] Although this Court has not had occasion to interpret unsound mind in the context of tolling, the term historically has been associated with the concept of legal incapacity. In *Miller v. Rhode Island Hospital,* 625 A.2d 778, 785 (R.I.1993), we used the term "unsound mind" interchangeably with the term "legal incompetence," holding that "a finding of legal incompetence or unsound mind is not a prerequisite to determine that a patient lacks the ability to make decisions regarding treatment." The terms incompetency and unsound mind have been used also in the context of guardianship, *In re Estate of Rathbun,* 44 R.I. 101, 105, 115 A. 705, 706 (1922), and in the context of establishing testamentary capacity, the measure of which is "the memory and understand-

---

7. The 1623 term *"non compos mentis"* and the 1905 term "unsound mind" likely rested on concepts and beliefs that ongoing medical studies have invalidated, and we have previously avoided an "unyielding adherence to an outmoded standard, sorely at variance with contemporary medical and legal knowledge." *State v. Johnson,* 121 R.I. 254, 257, 399 A.2d 469, 471 (1979) (replacing outmoded M'Naghten test with model penal code test for lack of criminal responsibility because of mental illness). We recognize, however, that the ever-expanding array of diagnosed psychiatric conditions, such as those set forth in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM IV), need not necessarily affect the interpretation of general legal terms such as "unsound mind."

ing of the person * * * as to the nature and extent of his estate, the proper objects of his bounty and the nature of the testamentary act." *Tavernier v. McBurney,* 112 R.I. 159, 163, 308 A.2d 518, 521 (1973) (quoting *Rynn v. Rynn,* 55 R.I. 310, 322, 181 A. 289, 294 (1935)).

Beginning in 1896 to the time of plaintiff's complaint, G.L.1956 § 43–3–7[8] stated: "The words 'insane person' shall be construed to include every idiot, person of *unsound mind,* lunatic, and distracted person." (Emphasis added.) We cited this statute in *Kelly* to support the proposition that "a finding of unsound mind is similar to a finding of insanity which is also made by the trial justice in the first instance after hearing or at trial," *Kelly,* 678 A.2d at 879 n. 6, and we have compared unsound mind to the legal term "insanity" in other instances. *See, e.g., Young,* 116 R.I. at 572, 359 A.2d at 699 (referring to the "historic [disabilities] of insanity, imprisonment, minority or absence from the country"). The fungibility of the term unsound mind with the term legal incompetency suggests that unsound mind has been used, like insanity, to denote a mental infirmity that vitiates legal capacity generally. For example, in *Sosik v. Conlon,* 91 R.I. 439, 164 A.2d 696 (1960), we explained that every mental disability would not necessarily preclude the execution of a contract:

"Mere mental weakness, or inferiority of intellect, will not incapacitate a person from making a valid contract; nor is it easy to define the state of mind which will have this effect. There must be such a condition of insanity or idiocy as, from its character or intensity, disables him from understanding the nature and effect of his acts, and therefore disquali-

fies him from transacting business and managing his property." *Id.* at 443, 164 A.2d at 698 (quoting *Longley v. McCullough,* 68 R.I. 395, 405, 27 A.2d 831, 835 (1942)); *see also Cundell v. Haswell,* 23 R.I. 508, 510–11, 51 A. 426, 427 (1902) (quoting 1 *Parsons on Contracts,* at 335 (8th Ed. 1893)).

Thus, *Sosik* supports the thesis that an unsound mind must disable an individual to a substantial degree before the condition rises to the level of a legal disability.

Although the legal history of the term "unsound mind" makes clear that the designation is intended to apply to the incapacity to carry out legal functions, an effective, operational definition of "unsound mind" has not been established. In defining the term, we must consider both the legal features of tolling disabilities and previous interpretations of the term.

■ In our opinion, "the inability to manage one's day-to-day affairs" provides a practical, operational definition of unsound mind. This definition accords with the historical attributes of legal disability and comports with the traditional use of the term as a form of legal incapacity and with this Court's previous connotation of unsoundness of mind as incapacity to manage one's affairs. *In re Estate of Rathbun,* 44 R.I. at 105, 115 A. at 706; *see also Smith v. O'Connell,* 997 F.Supp. 226, 235 (D.R.I.1998) (finding that unsound mind connoted "a completely incapacitating condition that renders a person legally incompetent"), *aff'd sub nom., Kelly v. Marcantonio,* 187 F.3d 192 (1st Cir.1999). At the same time, this definition of unsound mind can be applied readily by trial justices and fact-finders and refines the term by requiring objectively ascertainable actions or

---

8. This statute was repealed shortly after this case was filed. Public Laws 1996, ch. 287, §§ 1, 4.

inaction. Moreover, this Court has stated that "[e]xceptions in statutes of limitations in favor of persons laboring under disabilities are strictly construed." *Kenyon v. United Electric Railways Co.*, 51 R.I. 90, 94, 151 A. 5, 8 (1930). We believe that defining unsoundness of mind in terms of the concrete, objective standard of inability to manage one's day-to-day affairs complies with the statutory intent of the term and is consistent with our holdings in numerous cases.

### Plaintiff's Condition

■ Applying this definition of unsound mind, we next consider whether plaintiff's condition was such that it tolled the running of the three-year statute of limitations in § 9–1–14(b). In their motions to dismiss, defendants argued that plaintiff was not of unsound mind for purposes of § 9–1–19, and on appeal, they asserted that plaintiff evidenced the capacity to manage his day-to-day affairs of life by pointing to a discharge summary from Fuller Memorial Hospital, which described plaintiff, *inter alia,* as having normal abstraction and judgment and as being "oriented to time, place and person." The defendants also asserted that in four criminal prosecutions, plaintiff was never adjudged incompetent to enter a plea or to stand trial, and a psychological evaluation that Roe underwent for Social Security disability benefits showed him to be lucid, oriented, and able to manage his own money. Finally, defendants contended that plaintiff has not been diagnosed with any psychotic symptoms since he was thirteen years old.

The plaintiff, on the other hand, asserted that he was unable to manage his day-to-day activities and thus was of unsound mind for purposes of § 9–1–19, until some time within three years of the filing of his complaint. In support of his claim, Roe submitted, *inter alia,* his clinical records, prison records, portions of his deposition, and the Plummer affidavit that described plaintiff's severe mental illness during his childhood. The plaintiff contended that he "remained in the custody of the state either as a ward or as a convict, for much of the time between the [abuse] event and the filing of his complaint." At the hearing before the justice and on appeal, plaintiff argued that he was not "functioning normally in society" and that the evidence of his multiple diagnoses, which included atypical psychosis, conduct disorder, aggression, undersocialization, personality disorder, oppositional/defiant disorder, paranoid ideation, high anxiety, impaired social and environmental functioning, and mixed learning disabilities, gave rise to an inference that he was of unsound mind. The hearing justice rejected plaintiff's claim of unsound mind, at one point asking, "Does his inability to recall constitute unsound mind?" and later commenting, "You use that word non-normal to equate with unsound mind. I suggest to you it may not be so." He further explained that "one who may have a low IQ, may not be of unsound mind" and asked, "Wouldn't anyone that suffered from a psychiatric disorder * * * therefore meet the criteria that you set down for unsound mind * * * "? The justice continued, "There are many, many people that have psychological problems, but they are able to function," and he concluded that plaintiff's application of *Kelly* did not "comport with what I believe the universal interpretation of unsound mind is; one who is [un]able to take care of his day-to-day affairs."

After reviewing plaintiff's psychiatric history and his deposition, the hearing justice specifically found that the conditions plaintiff alleged did not qualify as a tolling feature within the purview of § 9–1–19 and that, although plaintiff repeatedly was hospitalized for psychiatric problems, he was

able to take care of his daily needs and responsibilities, manage his own money, wend his way through the criminal justice system, and seek representation for the present lawsuit. Consequently, plaintiff's disability did not fall within the legal definition of unsound mind. The motion justice, accordingly, found that the unsound mind provision of § 9-1-19 did not toll the three-year statute of limitations. We agree.

We are of the opinion that the facts alleged by the plaintiff do not rise to the level of unsound mind as defined in this opinion. Notwithstanding the plaintiff's "low average" IQ, memory problems, repeated hospitalizations, and numerous psychiatric conditions, including psychotic symptoms until the age of thirteen, the record revealed that he was, during some periods of his adult life, oriented in time, place, and person, able to manage his income, and competent to take part in criminal proceedings against him. Apparently, no court ever appointed a guardian *ad litem* on his behalf. This objective evidence of Roe's functional abilities suggests that, notwithstanding his psychiatric diagnoses, he still could take care of his day-to-day affairs. Although the plaintiff pointed out that he was unable to study for his GED and never held a driver's license, these circumstances do not prove an inability to manage daily functions. Thus, even taking the facts alleged in the light most favorable to the plaintiff, we are of the opinion that they do not establish an inability to manage the day-to-day affairs of his life. Accordingly, we agree with the motion justice that the facts do not support a determination that the plaintiff was of unsound mind for purposes of invoking the tolling provisions of § 9-1-19.

## Conclusion

In conclusion, we hold that the hearing justice correctly found that the plaintiff's mental condition did not constitute an "unsound mind" within the meaning of § 9-1-19, nor did he err in ruling that the defendants were entitled to judgment as a matter of law on the plaintiff's personal injury claims. In so holding, we do not question that cases of childhood abuse may go unreported for many years and may seriously impair later adult behavior. But in this case, neither the duration of the plaintiff's condition nor its effect on his ability to protect his legal rights can be specifically identified, even by the plaintiff himself. We decline to adopt a definition of unsound mind to include cases such as the plaintiff's that would, in effect, supplant the statute of limitations and the policies behind it. Our opinion here comports with our constitutional mandate that remedies are found by recourse to the laws, R.I. Const. art. 1, sec. 5, and it conforms to our common law and to the traditional understanding of these terms. As we have indicated, our opinion in this case is not a judgment on the validity of the plaintiff's allegations, nor should it be taken as a sign of insensitivity toward the painful and complex issues attending claims of childhood abuse and trauma. Rather, it represents this Court's endeavor to execute faithfully our obligations as an impartial and independent arbiter of the Constitution and laws of Rhode Island. To rule otherwise on the issues of this case requires statutory revision, a prerogative of the Legislature. Accordingly, we deny and dismiss the plaintiff's appeal, and affirm the judgment of the Superior Court, where the plaintiff's contract claims against St. Aloysius are pending, and to which we return the papers of this case.