DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE GROUNDS OF THE STATUTE OF LIMITATIONS
Defendants Louis E. Gelineau, Daniel P. Reilly, Kenneth A. Angell, Robert E. Mulvee, Thomas J. Tobin, the Church of the Holy Family, and the Roman Catholic Bishop of Providence, a Corporation Sole (collectively, "Hierarchy Defendants") move for summary judgment on the argument that Christopher Young's ("Plaintiff") action is time-barred. Plaintiff has objected to the Hierarchy Defendants' motion. For the reasons set forth below, the Court denies the Hierarchy Defendants' motion.
 BACKGROUND
Christopher Young commenced this action on March 13, 2003 against John Petrocelli and the Hierarchy Defendants. In his 150-page complaint, Plaintiff alleges that the Reverend John Petrocelli sexually molested him during his minority. Plaintiff claims that the Hierarchy Defendants are liable to him for injuries and damages that he suffered as a result of the assaults. Without restating the allegations in their entirety, the Court will review some of the pertinent assertions. In essence, Plaintiff contends that the Hierarchy Defendants engaged in both negligent and intentional misconduct by negligently, willfully, intentionally, and recklessly disregarding his rights by permitting Petrocelli to have contact with him and other children after he was known to them as a child molester. *Page 2 
Essentially, Plaintiff alleges that such willful and negligent misconduct occurred in connection with the following:
 1) hiring, supervising and retaining Petrocelli after they had actual or constructive knowledge that he was a sex offender and unfit to have access to children;
 2) failing to keep their premises reasonably safe;
 3) conspiring, fraudulently concealing and misrepresenting the dangers associated with having contact with Petrocelli;
 4) inflicting Plaintiff with emotional distress;
 5) violating their duty to act in loco parentis;
 6) invading Plaintiff's privacy;
 7) tortiously interfering with Plaintiff's parent/child and family relationships;
 8) breaching their fiduciary duty to Plaintiff; and
 9) breaching their statutory reporting duties to Plaintiff.
Plaintiff also claims that the Hierarchy Defendants are liable to him under the doctrine of Respondeat Superior and further alleges that their wrongful conduct was tantamount to criminality.
In his complaint, Plaintiff elaborates on the basis for these assertions. In part, Plaintiff asserts that Petrocelli had opportunities to molest him by virtue "of his position as a servant or agent under the authority, supervision, employ or control of" the Hierarchy Defendants. He further alleges that the Hierarchy Defendants "exerted control over and/or assumed responsibility for [Petrocelli], thus establishing and maintaining a relationship with a corresponding duty to refrain from intentionally engaging in a knowing and deliberate course of conduct resulting in or substantially certain to result in *Page 3 
harm to innocent child victims, including Plaintiff" and that they breached this duty. Additionally, Plaintiff asserts that, because the Hierarchy Defendants "knew that many priests in the Diocese of Providence had sexually molested children," it was their policy and practice to "secrete the identities, retain the services of, and protect pedophiles, ephebophiles, and/or other sexual offenders who are or had been Roman Catholic priests" and that they did so to avoid adverse impacts on "revenues collected by the church from parishioners." Plaintiff alleges that the Hierarchy Defendants "treated the sexual assaults of children by priests as scandal that was to be suppressed at any cost, knowing that suppression put the youth of the Diocese of Providence at risk." Plaintiff asserts that the Hierarchy Defendants operated a private psychiatric treatment system for treatment of priests exhibiting psychosexual disorders "to conceal and suppress the existence of the problem . . . and to affirmatively deceive the public by misrepresenting that a priest [was] `on leave,' on `retreat,' on `sabbatical and/or participating in `advanced studies,' when in fact he [was] sent away for evaluation and treatment due to sexual misconduct." Plaintiff alleges that the Hierarchy Defendants' primary concern was furthering their own interests and protecting the reputation of the priests, including Petrocelli, by concealing "the danger offending clerics present by misrepresenting them as priests in good standing" in a variety of ways, including enabling them to have "continued unrestricted access to minors." Plaintiff further contends that the Hierarchy Defendants gave him the false impression that he could rely upon them to protect him and that they breached their fiduciary duty to deal with him in good faith and "with the highest degree of trust and confidence." *Page 4 
Plaintiff asserts that the Hierarchy Defendants mishandled complaints against priests that had allegedly committed acts of sexual abuse by: concealing complaints; discouraging prosecution and civil litigation; making false promises to address complaints and taking preventive measures against future harm; ignoring and failing to properly investigate complaints; mistreating complainants; suppressing results of investigations; failing to maintain adequate records of offenders and complaints; and sealing records of litigation and settlements. Plaintiff also contends that the Hierarchy Defendants wrongfully protected the offending priests by: transferring offenders to new parishes, thereby exposing a new population of children to their abuse; maintaining known offenders in positions where they would have access to children; allowing the offending priests to return to prior assignments while misrepresenting the reasons for their absence; permitting the offenders to reside and serve as priests in settings where the Hierarchy Defendants could have foreseen that these priests would come into contact with young people; failing to suspend or remove the offending priests from their duties; holding the offenders out as competent, moral and fit priests; and giving refuge and defense to offending clerics. Furthermore, Plaintiff alleges that the Hierarchy Defendants failed to take necessary remedial and preventative measures by: failing to propose proper guidelines "for selection, maintenance, supervision and retention of priests"; failing to propose and implement policies to assist victims; and failing to warn parishioners and others that the cleric with whom they would reasonably have contact was, in fact, a sexual offender.
Additionally, Plaintiff contends that the Hierarchy Defendants' alleged misconduct interfered with Plaintiff's ability to identify the cause of his injuries, *Page 5 
concealed his claim from him, misrepresented to him or withheld from him facts constituting the basis of his claims, and delayed him from bringing his action "through practices of intimidation, duress and deception." He alleges an ongoing conspiracy designed to cover up and prevent public exposure of the sexual abuse of children by Catholic clerics.
The Hierarchy Defendants answered Plaintiff's complaint in February, 2004, denying the material allegations contained therein and asserting a statute of limitations defense.[1] They have filed the subject motion for summary judgment based upon that defense. In their motion and supporting memoranda, Defendants allege that Plaintiff commenced his lawsuit after the time allowed under the applicable statute of limitations, thereby barring his claims against the Hierarchy Defendants. G.L. 1956 § 9-1-14(b) requires a claimant to commence "actions for injuries to the person . . . within three (3) years next after the cause of action shall accrue, and not after," including claims made against non-perpetrator defendants in an action resulting from the sexual abuse of a minor. See Kelly v. Marcantonio, 678 A.2d 873, 877
(R.I. 1996). Section 9-1-19 tolls the running of this statute of limitations during a claimant's minority. Effective July 1, 1988, the Rhode Island General Assembly amended § 9-1-19 to reduce the age of majority from 21 to 18 years of age.
Plaintiff was born on March 14, 1979 and commenced this action against Petrocelli and the Hierarchy Defendants on March 13, 2003, on the eve of his 24th birthday.[2] If Plaintiff's cause of action accrued before July 1, 1988, he would be able to *Page 6 
file suit for up to three years following his 21st birthday. If so, this suit, which was filed shortly before his 24th birthday, would have been timely filed. If, on the other hand, Plaintiff's cause of action accrued on or after July 1, 1988, then he would have had to file suit within three years of his 18th birthday. In that case, the statute of limitations would have run on his 21st birthday, rendering this claim time-barred.
Plaintiff revealed the allegations of sexual abuse on May 6, 2002 to Monsignor Paul D. Theroux, Moderator of the Curia for the Diocese of Providence. The next day, on May 7, 2002, the Hierarchy Defendants' investigator, Robert McCarthy, interviewed Plaintiff about his allegations against Petrocelli. After the commencement of this lawsuit, the Hierarchy Defendants deposed Plaintiff on May 3, 2006 and again on August 16, 2006. Based upon the depositions, most, if not all, of the alleged abuse seemingly occurred after July 1, 1988. Thereafter, on November 30, 2006, Plaintiff served answers to interrogatories addressed to him by one of the Hierarchy Defendants, Louis E. Gelineau, and supplemented these answers on February 2, 2007. Based upon those interrogatory answers, most, if not all, of the alleged abuse appears to have occurred before July 1, 1988.
The Hierarchy Defendants assert that the cause of action accrued after July 1, 1988. In support of their motion for summary judgment, Defendants argue that the self-serving interrogatory answers constitute sham affidavits and, therefore, the Court should not rely on these answers when determining the dates of the alleged offenses. Plaintiff disputes this contention and argues that the interrogatory answers establish a genuine issue as to a material fact and that the Hierarchy Defendants' motion should be denied. *Page 7 
In the alternative, Plaintiff argues that the motion should fail because the Court should determine that the statute of limitations should be equitably tolled. The Hierarchy Defendants disagree. In his complaint, Plaintiff claims that he suffered delayed discovery of his claims and delayed discovery of the harm caused by the defendants and that such delays toll and/or suspend the statute of limitations. He pleads disability and/or incapacity within the meaning of § 9-1-19 as a result of psychological and psychiatric injuries he suffered as a result of the abuse and actions of the Defendants, which occurred at the time of the accrual of the cause of action and continued to a date not more than three years prior to the commencement of suit.
Plaintiff also argues that § 9-1-51 establishes Rhode Island's public policy to permit a victim of continuing sexual abuse or exploitation to seek redress from the courts even if the case would be time barred under other statutes of limitations. The Hierarchy Defendants reject Plaintiff's contention and assert that § 9-1-51 applies only to claims against the actual perpetrator.
 Interview of Plaintiff by Robert N. McCarthy
On May 7, 2002, Robert N. McCarthy interviewed Plaintiff at the diocesan Office of Education and Compliance.[3] At the time of the interview, Plaintiff was twenty-three years old. According to that taped interview, Plaintiff had contacted Monsignor Theroux the previous day to allege that Petrocelli had molested him when he was a child. Plaintiff indicated that he was flooded with memories one night while lying in bed after returning home from church. He then recalled several incidents that had occurred many years *Page 8 
earlier. He told McCarthy about his memories of the early incidents of abuse. One involved swimming with Petrocelli and another involved an incident which occurred when he failed his altar boy test. McCarthy asked Plaintiff how old he was at the time of the swimming incident, and Plaintiff responded as follows: "I believe I became an altar boy at the age of seven, uhm, I believe. Between the ages of seven and nine I believe is when these events actually occurred." (Plaintiff's Interview with McCarthy at 2.) When McCarthy repeated that he would have been seven years old, Plaintiff replied: "Yes, I believe so." (Id.) Plaintiff explained that he was then an altar boy and also in the Boy Scouts and attended CCD at Holy Family parish. He swam at Bryant College or at CCRI. According to Plaintiff, Petrocelli would shower and require Plaintiff to shower naked before and after swimming. Petrocelli would stare at Plaintiff in the shower, looking at him in the same way that Plaintiff "would look at a naked woman." Petrocelli was "actually staring and going over my body like, looking me up and down and with almost intensity [sic]." (Id. at 7.)
Plaintiff lived on the same road as the Parish. Thus, when Petrocelli drove Plaintiff and other individuals home from the swimming pool, Petrocelli would drop off Plaintiff last. While alone with Plaintiff in the front seat of the vehicle, Petrocelli allegedly touched Plaintiff "in inappropriate ways." (Id. at 10.) According to Plaintiff, Petrocelli put his hands on Plaintiff's legs and moved them up into his genital area. (Id.)
McCarthy questioned Plaintiff further as to the time frame of these incidents. Plaintiff responded that he "would have been in probably third grade, or fourth grade probably in the same two years. It was in the same two or three years between. . . ." (Id. at 7.) According to the interview transcript, McCarthy interrupted Plaintiff before he *Page 9 
could finish answering and asked if Plaintiff could recall the dates of the incidents, but Plaintiff could not recollect the specific dates. (Id.)
McCarthy continued the interview by establishing Plaintiff's date of birth as March 14, 1979. The interview continued as follows:
 McCarthy: So, if you were in the third grade, you'd been eight?
 Young: I'm not even specifically saying that I was definitely in the third grade but that is when I believe to. . . . (inaudible)
 McCarthy: . . . Now, you see I'm trying to determine what the, what the law would have been at the time so it's important to know the. . . .
 Young: Uhm-hmm
 McCarthy: . . . the approximate date
 Young: Ya, I would say between the time I was on the low end, I would say six and then the high end nine, I would say definitely in those three years without a doubt.
(Id. at 8.)
At McCarthy's urging, and in response to leading questions, Plaintiff acknowledged that he attended kindergarten as a five-year-old, first grade as a six-year-old, and third grade as a nine-year-old. (Id.).[4] Plaintiff was never sure about the dates or the calculations being made by McCarthy. He responded: "If that's what it comes out to be I believe then I guess sure." (Id. at 9.) *Page 10 
Following his own reasoning, McCarthy then added nine to Plaintiff's year of birth and suggested that the incidents occurred in 1988, rather than 1985, when Plaintiff would have been six years old. (Id.) Plaintiff replied: "Not necessarily though. I, I can't say an exact date because I do not exactly (inaudible word). . . ." (Id.) When Lt. McCarthy pursued this line of questioning, Plaintiff modified his range of dates by stating: "I would say definitely between ages seven and nine." (Id.)
McCarthy further prompted Plaintiff to pinpoint his age when the incidents occurred. Young recalled that the incident where Petrocelli touched his legs and genitalia occurred when he was probably eight years old, but possibly nine. (Id. at 11.) Plaintiff tried to establish the date by recalling his age when he became an altar boy, stating: "I was trying to figure out at what age I became an altar boy." (Id.) However, McCarthy ignored that reference and continued to suggest that they were "talking about eighty-eight then roughly when this happened." (Id.) Plaintiff replied: "Okay." (Id. at 12.)
Plaintiff persisted in referencing the dates of the incidents with the time he took his altar boy test and failed it. He said that it was "one of the first instances" he recalled. (Id.) Plaintiff stated that he was distraught and that Petrocelli talked to him, took Plaintiff in his arms, reassuring him while "rubbing his buttocks and genitalia." (Id.) He stated that the altar boy test would have been the beginning of the incidents and that it happened when he was "probably seven or eight years old". (Id.)
Plaintiff also recalled another incident inside the church Sacristy during Lent season while Petrocelli was undressed and wearing a tee shirt and briefs. Petrocelli asked Young to sit on his lap and then touched Young's buttocks and genitals for three to five minutes. (Id. at 15-16.) Plaintiff opined that this incident would have occurred probably *Page 11 
somewhere between the altar boy test and swimming excursion incidents. (Id. at 16.) When pressed again to identify the date of the altar boy test incident, Plaintiff hesitated and replied: "See, I don't know if it was in eighty-eight, or, or eighty-nine, I'm not sure." (Id.)
Additionally, Plaintiff remembered that Petrocelli had been a dinner guest at Plaintiff's home a few times and that Plaintiff had seen him on many other occasions "while camping with Boy Scouts and in Weeblos [sic]."[5] Plaintiff further stated: "So, I do recall that there could possibly be situations that have happened while being camping with Father John also." (Id. at 22.) Earlier in the interview, Young had stated: "I believe that I have blocked out a lot of information . . . and a lot more acts that actually happened." (Id. at 11.)
 Plaintiff's Deposition Testimony
After his interview with McCarthy, but before he supplemented his interrogatory answers, Plaintiff testified at depositions noticed by Defendants in this case. On May 3, 2006, and again on August 16, 2006, Plaintiff responded to questions asked of him by Defendants' counsel. Plaintiff gave the following testimony:
 I don't recall every instance of what had happened. The more I thought about it and the more I tried to remember, some of the suppressed memories from trying not to think about it, more of it started coming back to me . . . I knew some of the [sic] happened, but like I said, I suppressed some of it.
(Dep. of Plaintiff, 5/3/06 at 153.) However, Plaintiff did acknowledge that he was aware that Petrocelli's behavior was abusive when he "went back and looked through the *Page 12 
memories and thinking about different things and [he] would say it was somewhere late in [his] teenage years where [he] realized it though." (Id. at 152.)
Plaintiff testified that the first incident of abuse occurred when he failed the altar boy test. (Id. at 125.) Defense counsel attempted to have Plaintiff acknowledge that this incident occurred when he was at least in the fourth grade. Counsel showed Plaintiff a flyer from the church indicating the opportunity to be an altar boy was open to boys in grades four through twelve. Plaintiff denied that the flyer triggered his effort to become an altar boy. (Id. at 123.) Plaintiff testified that he did not know the age when a child could become an altar boy. (Id. at 124.)
Although Plaintiff testified that he did not recall having viewed the Boy Scout Videos marked as Deposition Exhibits C and D, defense counsel asked him to read the date on the bottom of the video, and he did. The video was dated "`89." (Dep. of Plaintiff, 8/16/06 at 206.) These questions and answers followed:
 Q: And you were a Cub Scout I think at the time, `89? You would have been ten, right?
 A: Yes.[6]
 Q: And at eleven, you became a Boy Scout; is that right?
 A: Okay.
 Q: Is that right?
 A: Yes.
(Id. at 207.) *Page 13 
The Court does not suggest that defense counsel intended to unnerve Plaintiff by asking certain questions which were particularly delicate. However, some of the questions were difficult for Plaintiff to handle and may have led to a loss of concentration on his part. Plaintiff was asked a series of questions concerning whether Petrocelli gave him an erection:
 Q: You said he masturbated you?
 A: Yes
 Q: Did he give you an erection?
 A: Don't remember at the time if he gave me an erection or not
 Q: Did he bring you to orgasm?
 A: I don't believe so.
 Q: But he fondled your genitals; is that fair to say?
 A: Yes.
 Q: You don't remember if you had an erection, you don't know if you ejaculated?
 A: No, I didn't ejaculate.
(Dep. of Plaintiff, 5/3/06 at 76.) Counsel further inquired:
 Q: . . . Do you feel that you did anything yourself inappropriately? It seems to me like what you're telling me is what Petrocelli did according to what you said is his fault. Would you agree with that?
 A: I don't see who else's fault it would be.
 Q: It's not your fault, right?
 A: No. *Page 14 
 Q: You can look back and say maybe I should have told somebody, maybe I should have reported him to the cops, but it's not like you asked him to do it?
 A: No.
 Q: And it's not like you were a willing participant; is that fair to say?
 A: No.
 Q: I could be wrong. Maybe you did like it, but I don't think you did.
 A: No, I didn't like it, but at the time I didn't know any better when you're ten or eleven years old."
(Id. at 161.) (Emphasis added.)
The Hierarchy Defendants rely, in part, on this statement as an admission by Plaintiff that the incidents occurred when he was ten or eleven years old. They argue that the Court should not permit Plaintiff to provide an interrogatory answer inconsistent with the statement. However, the Court considers the context in which the statement was made. The Court notes that Plaintiff's answer did not respond to the question asked, but reflected his reaction to a series of uncomfortable questions.
 Plaintiff's Initial Answer to Defendant Louis E. Gelineau's Interrogatory No. 21
Defendant's Interrogatory No. 21 states:
 Set forth the date or dates, and place or places, of each incident of sexual or other abuse or misconduct which you claim was perpetrated upon you by the Priest Defendant, and describe with particularity the circumstances and events of each such incident.
Plaintiff first answered the question, in pertinent part, as follows:
 To the best of my recollection the first of the abuse events occurred on the occasion where I being [sic] "tested" as to whether I could be an altar boy. That *Page 15 
occurred at or around the time of my first communion, which was in May of 1987. To the best of my recollection, the abuse continued over a period of about two years. After I failed the test, I was crying and really upset, Father John embraced me and started hugging me, and telling me everything would be fine, that he would be able to help me out and help me to study for the test and that I would definitely become an altar boy, and while he's doing this, he started running his hands down my back caressing me and started rubbing my buttocks and also my genitalia
 One instance I remembered was on a trip to Camp Yagoog alone with Father Petrocelli. He drove me in his car to fill out paperwork because I had not sold enough candy bars for a scouting event. We had gone on a hike in the woods in the early afternoon. . . . He started to rub my legs from my knees going more up towards my groin area, and then unbutton my pants and started to masturbate me.
 I was touched inappropriately many times on the drive home from the pool with Petrocelli after the other kids were dropped off. I remember him smiling, soaping himself up and looking me over. . . . I can recall him touching himself and soaping himself up while watching me shower naked.
 I recall he did this on another occasion, when we went on a trip somewhere near the Quonset Airport SeaBee base. We went for firewood and he molested me. . . .
 I remember another instance in the back of the church after mass one day, where they have all storage where you get dressed up. . . . I recall walking back there and Father Petrocelli was changing and he was in underwear and he told me to come over and sit on him. He started to like he usually did, talk to me, console me, at the same time started caressing my legs and touching me inappropriately.
 January 19, 2007 Hearing on the Hierarchy Defendants'Motion for Summary Judgment on Issue of Statute of Limitations *Page 16 
During the January 19, 2007 hearing, Plaintiff's counsel, Mr. Deluca, argued that his client was not good with years nor with his age during certain grades in school. (Tr. at 17.)
The Court replied: "But of course he needs to be, doesn't he? In other words, these people do need to know whether the statute of limitations bars this case or not." (Tr. 17).
Mr. Deluca added: ". . . by virtue of the way we do our interviews and the way we do our discovery and find facts, we'll be able to nail down all those things." (Tr. 18).
The Court: "All right. Because if you don't, you lose." (Tr. 18).
Co-counsel for Plaintiff, Mr. Conlon, suggested that the motion should be denied as to the first incident of abuse which purportedly took place in 1987. As to the subsequent incidents, he argued that:
 . . . if you take the totality, I mean, you're getting the when in Lents, which may or may not be a familiar thing to Your honor, but be this as it may, you can get into, okay, how he describes those incidents in those transcripts when he is interviewed by McCarthy and when he was in all of these various things, and you can put together a chronology of. . . .
(Tr. 51)
The Court interrupted:
 Well, why didn't you? You've got a motion for summary judgment. Why didn't you get an affidavit and put together a chronology. Why do you get this answer to interrogatory in the face of a motion for summary judgment that doesn't give that information? You could figure out when Lent is. Figure out when Lent is [now], not at trial . . . When a motion for summary judgment is filed, it is [incumbent] upon the non moving party to establish issues of fact by affidavit or otherwise. This Answer to Interrogatory does it on one incident and one incident alone, not on anything else. I'm continuing it two weeks. And, if you don't narrow *Page 17 
it down, you're going to have a problem. Two weeks to submit the appropriate affidavit or supplemental interrogatory answer. Otherwise, you're going to see how I'm going to rule on everything past the first incident.
(Tr. 51, 52, 53).
 Plaintiff's Supplemental Answer to Defendant Louis E. Gelineau's Interrogatory No. 21
On February 2, 2007, Plaintiff supplemented his answer to Interrogatory No. 21, stating the following: "[t]he best way for me to reconstruct the time line is to start with the first incident for which I can recall specific details, which, as I explained, occurred when I was taking a test to become an altar boy."
This method of identifying the dates of abuse is not inconsistent with his statement to McCarthy wherein he attempted to recall that event in answering McCarthy's questions about the date(s) of abuse. He stated to McCarthy: ". . . I was trying to figure out at what age I became an altar boy." (Plaintiff's Interview with McCarthy at 11.)
In his interrogatory answer, Plaintiff states that his altar boy test occurred around the time of his first communion in May, 1987. He stated that to the best of his recollection, "the abuse continued over a period of about two years." (Plaintiff's Supplemental Answer to Defendants' Interrogs. at 1.)
He referred to the incidents of abuse described to McCarthy as occurring between
the ages of "7 and 9." (Id. at 2.) He added:
 After reviewing the facts with my attorneys, I believe that although two of the four specific incidents definitely occurred between the ages of seven and nine, meaning after March 14, 1986, two of the four specific incidents I described for Mr. McCarthy may have occurred after I turned 9. However, the specific instances I described are *Page 18 
not the only times I was abused during the period between March 14, 1986 and March 14, 1988.
 Though I know I was abused on many occasions, I only remember the details of a few specific instances that I can distinguish from the others.
(Id.)
Plaintiff stated that he had known Petrocelli before he made his first communion and that he could not have become an altar boy until he had made his first communion. (Id.) He noted that he did become an altar boy shortly after first failing the test, which would have been between late May and June, 1987. (Id.)
Plaintiff alleges that Petrocelli had begun taking him swimming either shortly before the failed altar boy test or immediately thereafter. (Id.) He describes the swimming trips as the beginning of a relationship of abuse, but states that the inappropriate touching did not occur during the first several swim trips, but that once it did happen, it occurred regularly thereafter on the ride home from the swimming pool. (Id. at 3.)
Plaintiff referred to the incident in the Sacristy that occurred during Lent season, and concluded that it had occurred in the spring of 1988. (Id.) By that time, he had been abused by Petrocelli many times on swim trips. (Id.)
Plaintiff also related an incident that occurred on a trip to Camp Yawgoog when Petrocelli unbuttoned Plaintiff's pants and started to masturbate him. (Id.) He believes that this happened in the spring of his second or third grade, which he believes would have been in 1988 or 1989 and was the last of the specific incidents he recalled. (Id.)
Plaintiff also recalled an incident of abuse that occurred on a trip near Quonset Airport SeaBee base nine months to twelve months before the Camp Yawgoog incident. (Id. at 5.) *Page 19 
In his interrogatory answer, Plaintiff states that he knows that much of the abuse occurred before he was in third grade "because by that time there were some incidents that occurred at school that [he knows] came well after the incidents of abuse that [he has] described. [He] was caught masturbating in class by other students starting in the 3rd grade." (Id. at 6.) He concluded by stating: "by the fourth or fifth grade, I had come to understand that what he had done was abuse me. That was after the abuse, however, not during it." (Id.)
 APPLICABLE LAW
The Hierarchy Defendants seek summary judgment on the argument that Plaintiff's claims are barred by the applicable statutes of limitation. In considering a motion for summary judgment, the Court views the evidence in a light most favorable to the nonmoving party. After doing so, the Court should only grant the motion if he or she finds that no genuine issue of material fact is evident from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," and the moving party is entitled to prevail as a matter of law. Super. Ct. R. Civ. P. 56(c);Andreoni v. Ainsworth, 898 A.2d 1240, 1241 (R.I. 2006). The party opposing the motion for summary judgment has an affirmative duty to submit evidence that demonstrates a genuine issue of material fact.Konar v. PFL Life Insurance Co., 840 A.2d 1115, 1117 (R.I. 2004) (citingBourg v. Bristol Boat Co., 705 A.2d 969, 971 (R.I. 1998)).
The statutes of limitations applicable to this case are § 9-1-19 and § 9-1-14(b).[7] Section 9-1-14(b) provides that "actions for injuries to the person shall be commenced *Page 20 
and sued within three (3) years next after the cause of action shall accrue, and not after."
The Court ruled that the reasoning set forth in the case ofAnthony v. Abbott Laboratories, 490 A.2d 43 (R.I. 1985), was pertinent to the discovery rule applied to claims against non-perpetrators.
Under § 9-1-19, the running of the statute of limitations is postponed during a period of plaintiff's disability or infancy. Since July 1, 1988, this section has provided that:
 If any person at the time any such cause of action shall accrue to him or her shall be under the age of eighteen (18) years, or of unsound mind, or beyond the limits of the United States, the person may bring the cause of action, within the time limited under this chapter, after the impediment is removed.
This section was amended on July 1, 1988. The previous incarnation of the statute extended the disability to persons under the age oftwenty-one (21) years, rather than to persons under the age of eighteen(18) years.
In Kelly v. Marcantonio, 678 A.2d 873 (R.I. 1996), the Rhode Island Supreme Court declined to extend the discovery rule to claims against non-perpetrators. The Court did note that repressed recollection of past sexual abuse could toll the statute under the "unsound mind" provision in § 9-1-19. Kelly, 678 A.2d at 879. The Court found that such determination constitutes a question of law to be made by the trial justice. For the trial justice to apply this tolling feature, he or she would first have to conduct an evidentiary 678 A.2d 873 (R.I. 1996), the Rhode Island Supreme Court held that § 9-1-14(b) and § 9-1-19, not § 9-1-51, applied to claims against non-perpetrator defendants. The Court noted that § 9-1-51(e) requires that the childhood sexual abuse complained of must have been conduct committed by the defendant which would have been a criminal violation under chapter 37 of title 11. *Page 21 
hearing to consider expert medical and scientific evidence on the issue of whether the repressed recollection constitutes an unsound mind.Id.
 Kelly was decided before the Court adopted the reasoning set forth inDaubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).See DiPetrillo v. Dow Chem. Co., 729 A.2d 677 (R.I. 1999).DiPetrillo gives the trial justice guidance when considering whether proffered expert testimony on this subject is relevant to the facts of the case, scientifically valid and reliable. The trial justice should consider a non-exclusive composite of factors, such as:
 (1) whether the proffered knowledge can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique has gained general acceptance in the relevant scientific field.
Id. at 689 (citing Daubert, 509 U.S. at 593-594).
If, after considering the evidence in light of the aforementioned test, the trial justice determines that the evidence is scientifically valid and reliable, he or she then must determine whether the evidence of repressed recollections qualify as unsound mind disability under § 9-1-19. Again, the trial justice is guided by a case decided afterKelly. In Roe v. Gelineau, 794 A.2d 476 (R.I. 2002), the Rhode Island Supreme Court defined unsound mind as the inability to manage one's day-to-day affairs. The Court in Gelineau held that exceptions in statutes of limitations favoring plaintiffs under disabilities should be strictly construed. Gelineau, 794 A.2d at 487 (citing Kenyon v. UnitedElectric Railways Co., 151 A. 5, 8 (R.I. 1930)). The plaintiff in that case supported his claim that he was of unsound mind by offering an affidavit from a treating psychologist who merely opined that the plaintiff was not able to focus on or process the childhood sexual abuse he *Page 22 
suffered in therapy because "it was too difficult for him to deal with."Id. at 483. The Court found that such evidence did not meet the threshold matter that he suffered from the type of repressed recollection that would toll the statute. Id. at 484. It did not trigger the need for the type of evidentiary hearing discussed inKelly. Id. (citing DiPetrillo, 729 A.2d at 683-684).
 ANALYSIS
The Hierarchy Defendants argue that Plaintiff should not be permitted to establish a genuine issue as to a material fact by filing an affidavit that contains an unexplained, self-serving change to his prior testimony. The Hierarchy Defendants contend that the Court should consider the deposition testimony, given under oath, as conclusive on the issue of when the alleged incidents occur, and to do otherwise, would do violence to the summary judgment process. In the alternative, the Hierarchy Defendants seek to have the court grant summary judgment on all claims except the alleged incident that Plaintiff claims occurred after he failed his altar boy test.
The Hierarchy Defendants note that Plaintiff did not indicate at either deposition that he was confused. He made no effort after either deposition to correct his testimony nor did he make any effort to explain the contradictions in his supplemental interrogatory answer. He merely ignored the deposition testimony and gave an answer which was inconsistent with his prior version of events.
The Hierarchy Defendants assert that in his supplemental interrogatory answer, Plaintiff does not merely contradict the deposition testimony as to when the failed altar boy incident occurred. He also describes later incidents of abuse as occurring before July *Page 23 
1, 1988. The Hierarchy Defendants also assert that Plaintiff's counsel had an obligation to prepare him for his deposition.
The Hierarchy Defendants cite a series of cases which discuss the purpose of deposition testimony and the right of an adverse party to rely upon it. Some of the cases cited by the Hierarchy Defendants deal with the conduct of counsel when his or her client is being deposed. InHall v. Clifton Precision, 150 F.R.D. 525, 531 (E.D. Pa. 1993), an attorney was accused of interfering with a deposition by conferring with his client during the course of the deposition and by insisting that he be able to inspect documents before they were shown to the deponent. InIn re Stratosphere Corp. Sec. Litig., 182 F.R.D. 614, 620 (D. Nev. 1998), the court also addressed the issue of deposition protocol. InState ex rel. Means v. King, 520 S.E.2d 875, 882 (W.Va. 1999), the deponent contended that she was denied the right to counsel when she was prohibited from speaking to her lawyer during the deposition.
The Hierarchy Defendants cite Rules 3.3 and 3.4 of the Rhode Island Rules of Professional Conduct that "require that an attorney not purposefully allow false evidence or testimony to be given at a deposition." State ex rel. Means, 520 S.E.2d at 882 (summarizing the identical provisions of the corresponding rules in the West Virginia Rules of Professional Conduct). There is no question that an attorney has a professional obligation to refrain from intentionally allowing false testimony to be offered at a deposition. However, this rule does not invite an attorney to correct his or her client when the client becomes confused or fails to provide accurate dates and times. On the contrary, an attorney who interferes with his or her client's deposition testimony to correct such errors is subject to sanction in this state. The Rhode Island Supreme Court recognizes the *Page 24 
right of a party to question a deponent without interference inKelvey v. Coughlin, 625 A.2d 775 (R.I. 1993). In Kelvey, the Court ruled that attorneys accompanying clients to depositions must refrain from coaching the witness and from instructing his or her client not to answer a question unless it calls for privileged information.Kelvey, 625 A.2d at 776.
The Hierarchy Defendants also cite McKinley Infuser, Inc. v.Zdeb, 200 F.R.D. 648, 651 (D. Colo. 2001), for the proposition that Plaintiff's failure to correct presumably false information contained in his deposition should preclude him from later taking a position in interrogatory answers that is inconsistent with his prior deposition testimony. Although that case suggests that it would be preferable for the deponent to correct any misunderstanding or error in his deposition testimony by subsequent sworn testimony, it does not specifically address the issue of whether he should be precluded from doing so by affidavit. In McKinley, defendant was deposed over a two day period. A month after plaintiff's counsel completed his questions and after defendant's testimony had been transcribed, his own counsel sought to depose him. Plaintiff's counsel objected and argued that the scheduled deposition was likely an effort to defeat a potential motion for summary judgment by giving defendant a chance to change his testimony after being coached by his attorney. Plaintiff argued that defendant could correct any mistakes in the transcript with use of the errata sheets but should not be permitted to offer testimony after conferring with counsel which was inconsistent with that provided at his previous depositions. The court in McKinley disagreed and distinguished situations where an attorney seeks to interrupt the deposition when a question is pending to coach his client from a situation where an attorney consults with his or her client on an earlier or later *Page 25 
occasion. McKinley, 200 F.R.D. at 650. The court ruled that the "truth finding function" of a deposition is adequately protected so long as there is no coaching while a question is pending and that subsequent consultations, even after a prolonged recess, are permitted.Id.
The court in McKinley dismissed plaintiff's concern that the subsequent deposition would make the record less advantageous for plaintiff to prevail on a summary judgment motion. Id. at 650-651. In doing so, the court did state that a party should be permitted to develop the facts of the case in any appropriate manner, including presenting his version of the facts through deposition testimony elicited by his own lawyer. Id. at 651. This would give the defendant the opportunity "to clear up legitimate misunderstandings, if there are any; to supply complete information in areas where the examination by the plaintiffs was not complete; and to provide facts which the questioning by plaintiffs did not elicit at all." Id. In so noting, the court suggested that such testimony would not be subject to attack as a sham affidavit even if it provides the basis for denying a motion for summary judgment. Id.
The court in McKinley cited Franks v. Nimmo, 796 F.2d 1230 (10th Cir. 1986), which holds that a party may not create a genuine issue as to a material fact by submitting a sham affidavit. Franks, 796 F.2d at 1237. In Franks, defendants obtained summary judgment against plaintiff who had brought a wrongful termination case against them. The basis of the motion was the contention that Franks, as a probationary employee, was not afforded the protections from termination granted to permanent employees. After the motion was granted, Franks filed a motion for reconsideration, attaching an affidavit in *Page 26 
which he asserted for the first time that defendants had told him that he would be treated as a permanent employee. The court rejected the affidavit.
However, the court in Franks recognized that such rejection is unusual and an affidavit should not be disregarded merely because it conflicts with the affiant's prior sworn statements so long as it does not create a sham. Id. In determining whether the subsequent affidavit is a sham, the court should consider certain factors, including "whether the earlier testimony reflects confusion which the affidavit attempts to explain. Id.
In Franks, the court found that plaintiff's earlier testimony was unequivocal and that the affidavit was not offered until summary judgment had already been granted against him. Id. at 1237-1238. The court concluded that "this is one of those unusual cases in which the conflict between the testimony and the affidavit raises only a sham issue." Id. at 1237.
In this case, Plaintiff's testimony was not unequivocal. In fact, his first statement on the alleged abuse and the timing of the incidents was his interview with McCarthy, a representative of the Hierarchy Defendants. Plaintiff was not represented by counsel at that interview nor is there any suggestion that he was coached by anyone before speaking to McCarthy. In that interview, he stated that he believed that the incidents occurred between the ages of seven and nine. (Plaintiff's Interview with McCarthy at 2.) Plaintiff was unsure of the pertinent dates during that interview. Even the deposition testimony upon which the Hierarchy Defendants base their motion fails to provide unequivocal evidence that the alleged incidents occurred after July 1, 1988. Plaintiff offered the altar boy incident as a point of reference. A review of the deposition testimony reveals that *Page 27 
defense counsel skillfully attempted to push the dates forward by suggesting to Plaintiff how old he would have been at one time or another, and although Plaintiff did not challenge these suggestions, his testimony as to these dates was hardly unequivocal. (See Dep. of Plaintiff, 5/3/06 at 123, 124, 207.) A review of the interrogatory answer and supplemental interrogatory answer fails to reveal a sham.
It would have been preferable for Plaintiff and his counsel to have developed the chronology before he was deposed, and the Court does not intend to condone such delay, but the Court will not disregard the interrogatory answer merely because it was supplemented late and may contradict earlier testimony. While chastising Plaintiff for such delay, the Court is reluctant to impose such a harsh remedy as striking the supplemental interrogatory answer and possibly denying Plaintiff the right to pursue a claim that was timely filed.
Under the rules of evidence, the Hierarchy Defendants will have ample opportunity to cross examine Plaintiff and to expose any prior inconsistent testimony. Likewise, Plaintiff will have the opportunity to show any prior consistent statements to rebut any charge of recent fabrication or improper influence or motive. See R.I. R. Evid. 613(a), 801(d)(1)(2). Under Super. Ct. R. Civ. P. 32(a)(2), the deposition of a party may be used by the adverse party for any purpose.
Defendants argue that Plaintiff should not have been given a continuance to supply the supplemental interrogatory answer. Super. Ct. R. Civ. P. 56 requires that the non moving party must show by competent evidence the existence of a genuine disputed material fact. Rule 56(f) permits the non moving party to obtain a continuance of the motion for summary judgment when it appears "from the affidavits of a party opposing *Page 28 
the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's position." The Hierarchy Defendants argue that the Court should not have allowed Plaintiff additional time to file an opposing affidavit since Plaintiff did not provide the court with "good cause" for seeking a continuance. The issue before the Court is not whether to grant a continuance to submit a supplemental answer, but whether to strike the supplemental answer that was submitted following a continuance.
Additionally, the Hierarchy Defendants' reliance on Rule 56(f) and on the case of R.I. Depositors' Econ. Prot. Corp. v. Ins. Premium Fin. Inc., 705 A.2d 990 (R.I. 1997), is misplaced. In that case, the defendant argued that the motion judge erroneously denied a continuance which had been requested under Rule 56(f). The Court found that the defendant failed to meet the criteria for a continuance under that rule, and as such, the motion justice did not abuse his discretion. From this decision, it may be inferred that a motion justice who denies a continuance to a non moving party who meets the requirements of the rule may have abused his or her discretion. However, the case does not address situations where the motion justice exercises his or her discretion and grants a continuance where the non moving party fails to demonstrate that he or she is entitled to it under Rule 56(f). Neither the case nor the rule set forth a standard precluding the motion justice from exercising his or her discretion and granting a continuance.
 PLAINTIFF'S ALTERNATIVE ARGUMENTS Statute of Limitations is extended under § 9-1-51
Plaintiff contends that § 9-1-51 evidences a legislative intent to extend the time in which a victim of continuing acts of sexual assault can file a law suit against any party legally responsible for the injury, including non-perpetrator defendants. However, the *Page 29 
Rhode Island Supreme Court addressed this very issue in Kelly. InKelly, the Court held that § 9-1-14(b), and not § 9-1-51, applied to claims against non-perpetrator defendants, such as the claims against the Hierarchy Defendants herein. As set forth in § 9-1-51(e), the act upon which the claim is based must have been an act which would have been a criminal violation under chapter 37 of title 11. See Kelly,678 A.2d at 876. The "childhood sexual abuse" must have been an "act committed by the defendant." Id. There is no allegation that the Hierarchy Defendants themselves committed acts of childhood sexual abuse.
 Statute of Limitations should be equitably tolled
Plaintiff argues that the motion should fail not only because the incidents occurred prior to July 1, 1988, but also because the statute of limitations should be equitably tolled. The Hierarchy Defendants disagree. In his complaint, Plaintiff claims that he suffered delayed discovery of his claims and delayed discovery of the harm caused by the defendants and that such delays toll and/or suspend the statute of limitations. He pleads disability and/or incapacity within the meaning of § 9-1-19 as a result of psychological and psychiatric injuries he suffered as a result of the abuse and actions of the Hierarchy Defendants. He claims that the disability occurred at the time of the accrual of the cause of action and continued to a date not more than three years prior to the commencement of suit.
In his deposition testimony, which is not countered by affidavit or otherwise, Plaintiff acknowledges that he became aware, not only of the facts of his claim, but also of the wrongful nature of Petrocelli's conduct when he was in his late teenage years. He testified: *Page 30 
 Q: When did it first occur to you that this was abusive behavior? When did the light bulb go on?
 A: I don't recall an exact date.
 Q: Was it when you were speaking with your former girlfriend Christine, or did it come on before that?
 A: I believe it came on before that.
 Q: Can you key us into the event, what it was? Was it something you were watching or reading or thinking about that sort of made it click?
 A: No, just going back and looking through the memories and thinking about different things and I would say it was somewhere late in my teenage years where I realized it, though. . . .
(Dep. of Plaintiff, 5/3/06 at 152.) The questioning continued:
 Q: I take it over the years you read about these priest abuse cases —
 A: Yes, I've seen them in the paper.
 Q: — and the scandal that relates to that?
 A: Yes.
 Q: Did that help you remember what happened?
 A: No, not really.
 Q: Had you already remembered what happened and figured out it was bad before you started reading it in the papers?
 A: Yes, but I don't recall every instance of what had happened. The more I thought about it and the more I tried to remember, some of the suppressed memories from trying not to think about it, more of it started coming back to me. *Page 31 
 Q: Did you repress your memory of the events and they started being recovered or did you just not realize?
 A: I knew some of the [sic] happened, but like I said I suppressed some of it.
 Q: Are you still remembering everything?
 A: Pretty much all of it back.
(Id. at 153.)
Considering the holdings in Kelly and Gelineau, it is apparent to this Court that Plaintiff's argument fails absent a finding of unsound mind. The Court has had ample opportunity to adopt the equitable theory advanced by Plaintiff in cases with similar allegations to those advanced by Plaintiff, but has declined to do. Instead, the Court has upheld the statute of limitations absent scientific evidence of unsound mind.
In Gelineau, a 2002 case based upon similar allegations as the instant matter, the Court specifically addressed the competing public policy considerations behind the statute of limitations on one hand and the tolling statute on the other. The Court stated that "[S]tatutes of limitation promote certainty and finality and avoid stale claims, whereas tolling statutes provide temporary shelter from those limitations for plaintiffs who cannot protect their legal rights while under certain impediments. After the removal of the impediment, claims must be brought within a specific time." Gelineau, 794 A.2d at 485.
Plaintiff has offered no evidence that would trigger the type of evidentiary hearing on the issue of unsound mind referred to in these cases. Plaintiff has offered no evidence that would lead the Court to conduct an evidentiary hearing to enable him to offer expert medical and scientific testimony on the issue of whether the statute of limitations should *Page 32 
be tolled due to repressed recollections constituting the unsound mind disability provided in § 9-1-19.
 CONCLUSION
For the reasons set forth herein, the Hierarchy Defendants' motion for summary judgment is denied. There exists a genuine issue as to a material fact as to whether the alleged incidents of abuse occurred before or after July 1, 1988. The jury can determine these factual issues by special interrogatories. In the event that the finder of fact determines that some or all of the alleged incidents of abuse occurred after July 1, 1988, with respect to such alleged incidents of abuse, Plaintiff's claims are time barred. Plaintiff's alternative arguments fail. The statute of limitations shall not be extended either under § 9-1-51 nor under Plaintiff's theory of equitable tolling.
Counsel shall submit the appropriate order for entry.
[1] Defendant Thomas J. Tobin was not named in the original complaint, but joins in thismotion.
[2] See footnote number 1.
[3] Robert N. McCarthy is a former Massachusetts State Police Officer and the current Director of the Office of Education and Compliance for the Roman Catholic Diocese of Providence.
[4] The Court notes that Lt. McCarthy neglected to follow his own reasoning for establishing Plaintiff's age by not suggesting to Plaintiff that he may have been seven years old in second grade and eight years old in third grade. Instead, Lt. McCarthy jumped from first to third grade and from age six to age nine.
[5] "Weeblos," as mentioned in the interview, appears to refer to a program within the Boy Scouts of America.
[6] It is unclear to the Court which of the two questions Plaintiff was answering — that he was a Cub Scout at the time or whether he would have been ten in 1989.
[7] Plaintiff argues that § 9-1-51 establishes Rhode Island's public policy to permit a victim of continuing sexual abuse to seek redress from the courts even if the case would be time barred under other statutes of limitations. The Court disagrees. In Kelly v.Marcantonio, 678 A.2d 873 (R.I. 1996), the Rhode Island Supreme Court held that § 9-1-14(b) and § 9-1-19, not § 9-1-51, applied to claims against non-perpetrator defendants. The Court noted that § 9-1-51(e) requires that the childhood sexual abuse complained of must have been conduct committed by the defendant which would have been a criminal violation under chapter 37 of title 11. *Page 1